703 A.2d 1267

**John Clifton JOHNSON**

v.

**STATE of Maryland.**

**No. 120, Sept. Term, 1996.**

Court of Appeals of Maryland.

Jan. 6, 1998.

**340**

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender; Martha Weisheit, Asst. Public Defender, on brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

Appellant, John Clifton Johnson, was convicted at a bench trial in the Circuit Court for Allegany County of both premeditated and felony varieties of first degree murder of Edwin Donald Hartman, Sr., robbery with a deadly weapon of Mr. Hartman, carrying a deadly weapon openly with intent to injure, and assault upon Brian Kinser. The court imposed the death penalty for the first degree murder and terms of imprisonment for the other offenses consecutive to sentences then being served by the appellant. The case is before this Court pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 414.

Ample evidence was offered at trial of the following facts supporting the convictions. At approximately 10 p.m. on April 19, 1995, appellant parked the automobile he had borrowed from his girlfriend, Amy Parker, in a wooded area near Hartman's store on Valley Road in the suburbs of Cumberland, Maryland. He entered the store, confronted Hartman and then inflicted multiple stab and cutting wounds with a knife he had carried to the store, causing Mr. Hartman's death.

As Mr. Hartman's body lay in a pool of blood on the floor of the store, appellant went to the cash register but was unable to open it. As he was trying to do so Brian Kinser, who lived about 1/4 of a mile away, entered the store, observed Mr. Hartman's body and appellant attempting to open the cash register. He recalled that appellant was "real bloody" and that he appeared confused as he was trying to pry open the cash register with a knife. When Johnson noticed Kinser he put the knife in his jacket, and said "Oh, my God." Johnson then pulled out a small silver handgun, aimed at Kinser and said "Don't even try it." Kinser immediately ran to his cousin's house located near the store and reported what he had observed in an emergency call to the police.

Soon after Kinser left, Johnson took some Marlboro cigarettes and a few dollars from the store and returned to the car he had parked in the woods. As he drove from the store, Johnson ran the automobile off the road.

After returning the damaged automobile to Amy Parker, Johnson telephoned Christopher James Kroner, his half-brother, and asked Kroner to pick him up at Ms. Parker's home which is in Wiley Ford, West Virginia. Christopher James Kroner and his wife, Iris Kroner, traveled from their home in Piedmont, West Virginia to Ms. Parker's home. They arrived there at approximately midnight and found Johnson waiting outside the house. They recalled that he appeared "half-drunk," "confused" and "disoriented." At Johnson's request the Kroners agreed to take Johnson to his home in Augusta, West Virginia. On the way, Johnson told the Kroners that he

had "robbed" a store and stabbed someone. After they crossed the Blue Beach Bridge in West Virginia, Johnson told Mr. Kroner to stop the car. Johnson got out of the car with a red Marlboro bag that he had brought with him and threw something over the embankment at the side of the road.

The Kroners did not believe the story Johnson told about the robbery and the stabbing until they read the next morning's newspaper account of the crimes. They then called the police and reported what had happened the previous evening and earlier that morning.

Johnson was arrested on April 20, 1995, in Baltimore County, Maryland where he was staying with relatives. We will recite additional facts as necessary in addressing the several contentions of the appellant.

## I. GUILT/INNOCENCE PHASE

### A. *REQUEST FOR FILING BELATED NCR PLEA*

Appellant seeks a reversal of his convictions and the sentences imposed thereon because he was not permitted to file a belated "not criminally responsible" (NCR) plea on the first day of his scheduled trial. We decline to do so and explain.

Maryland Code (1982, 1994 Repl.Vol.), § 12–109 of the Health—General Article governs the procedure for filing a NCR plea. It provides in pertinent part:

"(a) *Time and manner of pleading.*—(1) If a defendant intends to rely on a plea of not criminally responsible, the defendant or defense counsel shall file a written plea alleging, in substance, that when the alleged crime was committed, the defendant was not criminally responsible by reason of insanity under the test for criminal responsibility in § 12–108 of this title.

(2) A written plea of not criminally responsible by reason of insanity shall be filed at the time provided for initial pleading, unless, for good cause shown, the court allows the plea to be filed later."

The time for the filing of a NCR plea in a circuit court is also addressed in Md. Rule 4–242(b)(3):

"(3) *Time in Circuit Court.*—In circuit court the defendant shall initially plead within 15 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213(c). If a motion, demand for particulars, or other paper is filed that requires a ruling by the court or compliance by a party before the defendant pleads, the time for pleading shall be extended, without special order, to 15 days after the ruling by the court or the compliance by a party. A plea of not criminally responsible by reason of insanity shall be entered at the time the defendant initially pleads, unless good cause is shown."

Johnson, accompanied by his counsel, made his initial appearance before the court on July 18, 1995, at which time he filed a plea of not guilty to the several charges contained in the criminal information lodged against him. As early as April 28, 1995, defense counsel filed a motion for transportation of Johnson from the Allegany County Detention Center to the office of Jeffrey Janoski, M.D. of Lutherville, Maryland who had been retained by the defense for a psychiatric evaluation. In that motion counsel represented that his "investigation indicates that substantial mental health issues may exist in the case with regard to both guilt/innocence and penalty issues." The trial court ordered that Johnson be transported for that purpose on May 2, 1995. Nevertheless, as indicated above, no NCR plea was filed at the time Johnson entered his plea at his initial appearance before the court.

The trial date was initially set for January 9, 1996. Acting on a joint request of the State and the defense, that date was changed by the court on December 15, 1995, to February 27, 1996. On February 5, 1996, the court announced to counsel that the guilt/innocence phase of the trial would begin on February 27, 1996, and that a sentencing hearing, if necessary, would commence on March 11, 1996. On February 11, 1996, defense counsel again sought a continuance of the scheduled

trial date. He represented to the court that Johnson had recently been seen by Dr. Jonathon Pincus, a neurologist in connection with a guilty plea Johnson had entered in an unrelated case. Dr. Pincus had recommended that Johnson be examined by a psychiatrist specializing in multiple personality disorders, and defense counsel wished to pursue that avenue before proceeding to trial. The court granted a continuance, setting a new trial date for April 9, 1996. Subsequent to the psychiatric examination of Johnson, defense counsel informed the court that no NCR plea would be filed.

It was not until the beginning of the first day of trial that Johnson sought to file a belated NCR plea. The court found no good cause had been shown for the belated filing of the plea, stating:

"The fact remains that on any number of occasions, the Defendant has been in a position to ... accounting from July of 1995 to file a plea of not criminally responsible. In fact trial dates were scheduled and continued at Defendant's request for the purpose of allowing neurological and other examinations relating to mental status as late as February of this year after a trial date had been scheduled for February 27. And it's my recollection that the trial date was selected after consultation with Defense to ensure that the Defendant had ample time not only to have the evaluations and examinations performed, but to produce those experts for trial should that become necessary. Hence, today's trial date was essentially arrived at by agreement for the ... at Defendant's convenience ... But for all those reasons, I do not find good cause under the Rule to extend the ... expand the time for filing of a not criminally responsible plea. The time in my view under the way this case has been managed having passed, and no further good cause has been shown."

Under both Md.Code, § 12–109 of the Health General Article and Md. Rule 4–242(b)(3), an NCR plea ordinarily must be filed at the time a defendant initially pleads. Only two exceptions to that requirement are provided. The first is not

applicable under the facts of this case,[1] and the second requires the defendant to show good cause for the belated plea.

■ The trial judge in deciding whether the defendant had shown cause for a belated NCR plea took into account the fact that Johnson had been represented by counsel since soon after his arrest and that his counsel recognized at the outset that "substantial mental health issues" were presented by his case. It was for that reason that he moved and was granted an order on May 2, 1995, to transport Johnson for a psychiatric evaluation by a psychiatrist of his choice. The trial judge also was told by defense counsel at the hearing on April 9, 1996, that one factor that weighed in favor of not filing an earlier NCR plea was the belief that Johnson had a limited likelihood of success with an NCR plea. In *Grandison v. State,* 305 Md. 685, 711, 506 A.2d 580, 593 (1986), we considered the paucity of proof that defendant was not criminally responsible as an important factor justifying the trial judge's refusal to permit the filing of a belated NCR plea on the eve of the date set for trial. We there commented upon the good cause requirement for the exception to the time constraints upon the filing of a belated NCR plea:

> "Although not in the context of the insanity plea, we have previously held that a statutory requirement of "good cause" vests the trial court with wide discretion. *See State v. Frazier,* 298 Md. 422, 470 A.2d 1269 (1984) (discussing "good cause" in context of postponement of trial date; *State v. Jones,* 270 Md. 388, 312 A.2d 281 (1973) (analysis of "good cause" requirement to permit a requested withdrawal of an accused's jury trial waiver)). We now hold that the "good cause" requirements of § 12–108 (now 12–109) and former Rule 731 (now 4–242(b)(3)) likewise endow the trial court with broad discretion. Thus the trial judge's determination is entitled to the utmost respect and should not be overturned unless there was a clear abuse of that discretion.

---

1. An exception is made "[i]f a motion, demand for particulars, or other paper is filed that requires a ruling by the court or compliance by a party before the defendant pleads." Md. Rule 4–242(b)(3).

*Madore v. Baltimore County,* 34 Md.App. 340, 346, 367 A.2d 54, 58 (1976)."

Moreover, the court was aware that the trial had been postponed three times, twice at the request of Johnson to accommodate mental evaluations by experts of his choice. Considering all of these factors, the trial judge did not abuse his discretion in denying the filing of a plea at the beginning of the first day of trial, almost nine months after it was required to be filed by the governing statute and rule.

█ Finally, we are not persuaded that the belated NCR plea was justified because the court, at the request of the State, ordered on April 2, 1996, that Johnson undergo a mental evaluation by a psychiatrist of its choice for use solely at the sentencing hearing, if one became necessary. Defense counsel proffered that the decision to forgo a NCR plea was a tactical one based on the belief that the State would not be entitled to a psychiatric examination unless such a plea was filed.[2] Johnson argues that "when the trial judge granted the State's belated motion for such an examination, the defense lost the tactical advantage it had hoped to gain. Under those circumstances, it was only fair that the trial judge also extend the time for filing a NCR plea." He contends that, because this trial strategy was undermined by the court's subsequent order granting the State's motion for a psychiatric examination, this constituted good cause which necessarily allowed the entry of a belated NCR plea.

█ Johnson's argument fails for several reasons. First, Johnson's failure to file a NCR plea did not preclude the State from obtaining an evaluation of Johnson's mental status by a psychiatrist of its choice since Johnson intended to rely at any

---

2. In appellant's Motion for Reconsideration and Recission of the April 3, 1996 order granting the State's Motion for Psychiatric Examination, appellant's counsel stated "[t]hat since in counsel's opinion, greater harm could be caused by placing the defendant in the State's psychiatric hands resulting from a plea of Not Criminally Responsible than would benefit be obtained, Counsel, given the Court's denial of the State's [original] Motion for Psychiatric Examination, refrained from entering such a pleading."

sentencing hearing on "a substantially impaired" mental status as a mitigating circumstance against the imposition of the death penalty. Md. Rule 4-263(d)(1). *Hartless v. State,* 327 Md. 558, 564, 611 A.2d 581, 583–84 (1992). The State was entitled to the mental examination, whether or not appellant filed a NCR plea. The trial court's exercise of sound discretion in whether to order a mental examination was in accord with Maryland law. In the circumstances of this case, defense counsel could not alter the degree of this discretion simply by invoking its earlier trial strategy. Second, defense counsel's argument implicitly embraces the premise that the defense was entitled to the tactical advantage it had earlier hoped to achieve by failing to enter a NCR plea. Such a premise is unsound. In a criminal trial, whether it be capital or otherwise, neither side is *entitled* to a "tactical advantage."

### B. *MOTION TO SUPPRESS APPELLANT'S STATEMENTS*

Appellant next argues that the lower court erred in denying a motion to suppress all statements made by him to the police. He asserts that the trial judge erred in finding some of his statements admissible, arguing instead that they were the result of improper inducements and in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States, Articles 22 and 24 of the Maryland Declaration of Rights and the Maryland common law. We do not agree with this contention and hold that there was sufficient attenuation between the improper inducements and Johnson's statements.

Johnson was arrested by the Maryland State Police on April 20, 1995, at a house in Essex, Baltimore County, at approximately 4:00 p.m. Upon his arrest he was advised of his *Miranda* [3] rights and was then transported to the Golden Ring barracks. At approximately 8:30 p.m. that day, Trooper Michael Grant of the Maryland State Police began to question the Appellant after again giving him the *Miranda* warnings.

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

During the course of the interview, which lasted about one hour, Trooper Grant indicated to appellant that if he confessed to the murder he might be able to receive some sort of "medical treatment at Perkins" instead of being "locked up for the rest of your life and the key thrown down the sewer." In addition, in response to a question from Johnson, Trooper Grant intimated that if appellant confessed, his mother's live-in boyfriend, who had driven Johnson to Baltimore County, would likely be released from custody. Johnson refused to talk about the murder and instead indicated that he wanted a lawyer. At that point, Trooper Grant discontinued the interrogation.

The following day, April 21, 1995, Detective Craig Robertson and Corporal Jon B. Dudiak, both of the Allegany Sheriff's Department, arrived at the Golden Ring barracks at approximately 2:00 p.m. to take custody of Johnson and to transport him to the Cumberland Police Department in Allegany County. He arrived at about 5:00 p.m. and, after being photographed and fingerprinted, he was again read his *Miranda* rights. He continued to refuse to talk about the murder but he gave a statement on an unrelated robbery. Appellant was then transferred to the Allegany County Detention Center in Cumberland, Maryland.

Two days later, on April 23, 1995, Detective Robertson went to the Allegany Detention center on an unrelated matter, and he saw Appellant in the hallway talking on the telephone. A correctional officer told Detective Robertson that Appellant wanted to speak with him. While speaking to the detective, Johnson indicated that he wanted to make a deal and that he intended to ask for the death penalty at trial. Detective Robertson advised Johnson that he did not have the authority to make a deal and that the Appellant should speak to his lawyer about it. He further advised Johnson that it would have to be worked out between his lawyer and the State's Attorney. Detective Robertson had to leave for a meeting, but he told Appellant he would come back if Appellant still wanted to talk.

Upon his return, Detective Robertson had a correctional officer ask Johnson if he still wanted to talk, and Appellant responded that he did. Detective Robertson again advised Johnson that he should contact his lawyer. Appellant stated that he wanted to talk without a lawyer. Detective Robertson and Corporal Dudiak then transported Johnson back to the Cumberland Police Department where he was again advised of his *Miranda* rights. Johnson executed a written waiver of his *Miranda* rights at 8:27 p.m. He then confessed to being at the murder scene but he indicated that he could not remember everything about that night. When he began to hyperventilate while reducing his statement to writing, the detectives stopped the interview. The abbreviated written statement was admitted at trial along with Detective Robertson's oral summary of the interview.

The trial court granted Appellant's motion to suppress all other statements made, including those made at the Golden Ring barracks to Trooper Grant, those made while the defendant was being transported to the Cumberland Police Department on April 21, 1995, and those made at the Allegany County Detention Center on April 23, 1995, prior to being transported back to the Cumberland Police Department. The trial judge refused to suppress the statement made to Detective Robertson and Corporal Dudiak at the Cumberland Police Department on the evening of April 23, 1995, even though defense counsel argued that the improper inducements made at the Golden Ring barracks on April 20 by Trooper Grant were still influencing the defendant. The trial judge ruled that because the Appellant initiated the contact with Detective Robertson and there was sufficient attenuation between the two events, the statements were admissible. We agree and we shall affirm the trial judge's ruling.

◼ As a threshold matter, we must decide whether Johnson's request for an attorney at the Golden Ring barracks requires exclusion of the statements at issue. Under the facts of this case, we hold that it does not. In *State v. Conover*, 312 Md. 33, 38, 537 A.2d 1167, 1169 (1988), we recounted the

constitutional requirements regarding custodial interrogation of a defendant by reiterating that "[w]hen an individual in custody requests an attorney, interrogation must cease until an attorney is present, **unless the accused himself initiates further communication, exchanges, or conversations with the police.**" Citing *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (Emphasis added). In this case, the trial judge found that the evidence revealed that Appellant did in fact initiate contact with Detective Robertson two days after being transported to the detention center.

■■■ Turning to the merits of Appellant's argument, we hold that the trial court did not err in refusing to exclude the statements made by Appellant after he initiated contact with Detective Robertson. When discussing voluntariness of a confession under common law principles, in *Reynolds v. State,* 327 Md. 494, 509, 610 A.2d 782, 789 (1992) we observed "[o]ne common thread that runs through our cases is that the promise must have *caused* the suspect to confess. If a suspect did not rely on an interrogator's comments, obviously, the statement is admissible regardless of whether the interrogator had articulated an improper inducement." (Emphasis added). Thus, it is the trial judge's responsibility to determine not only if an inducement was made, but to ascertain further whether or not the defendant was influenced by the inducement. *Ralph v. State,* 226 Md. 480, 486, 174 A.2d 163, 166 (1961). In this case, the trial judge found and the State agreed that the promises made at the Golden Ring barracks by Trooper Grant were very likely improper inducements, and any inculpatory statements made as a result were properly suppressed. In addition, statements made the following day while being transported to Cumberland, although still not a confession to the murder, were also deemed to be inadmissible as a result of the possible lingering effect of the inducements made the prior day.

As we further reasoned in *Reynolds, supra,* "the Supreme Court made it clear that constitutional voluntariness does not require that all promises, threats, or inducements render a confession involuntary; instead, the federal constitution requires only that courts consider promises, threats, or inducements as part of the totality of the circumstances that courts must look at to determine voluntariness." Citing *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The trial court found, and we agree, that the statements made two days later, in a different environment and in the presence of completely different interrogators, were not the result of the inducements made earlier. The defendant had the opportunity and time for deliberate reflection, and he did not manifest any behavior at the time of his confession indicating that he believed that his confession would be beneficial to someone else or that he believed he would receive any special treatment from the authorities.

In *Burch v. State,* 346 Md. 253, 696 A.2d 443 (1997), the defendant was convicted of multiple offenses, including first degree murder for which the death penalty was imposed. On appeal he sought to have certain statements that he made to police suppressed based on allegations of police brutality at the time of his arrest. According to the defendant, the arresting officers inflicted several types of abuse during his arrest, although none of those officers was involved in the interrogation. Instead, the interrogation was conducted by a detective who was not involved with the arrest. We affirmed the trial court's denial of defendant's motion to suppress, holding that even if abuse by the arresting officers did occur, the interrogating detective did nothing on his own to induce a statement. In fact, the confession was given in a secure environment and the defendant made no complaint about the abuse allegedly inflicted nor did he appear to be suffering from or under the influence of it. *Id.* at 268, 696 A.2d 443.

The same reasoning can be applied to the case *sub judice.* Here, Appellant argues that the improper inducements made two days earlier, in a different location and by a different police officer, caused him to confess. At the time of his

confession, however, not only did Appellant initiate the contact with Detective Robertson, he was fully aware that Detective Robertson was not present during the prior interrogation at the Golden Ring barracks, yet Appellant did not ask the detective a single question regarding any possible treatment in lieu of incarceration, nor did he acknowledge or comment on his possible motives for wanting to speak with the detective. All of the statements made by Johnson that may have been the result of improper inducements made at the Golden Ring barracks were properly suppressed, but Appellant's assertion that these inducements were still acting on him two days later, in a different environment, while dealing with a different individual, simply is unpersuasive. There was no error.

## II. SENTENCING HEARING

We now turn to the issues presented on appeal relating to the sentencing phase of the trial. Appellant presents the following three issues as grounds for reversal of his sentence of death and a remand for a new sentencing hearing:

I. Did the trial judge err in using an erroneous definition of the mitigating circumstance, "Youthful age of the defendant?"

II. Did the trial judge err by admitting improper victim-impact evidence and the survivor's opinions about the defendant and the appropriate penalty for the murder?

III. Was the trial judge clearly erroneous in failing to find that the murder was committed while the appellant's capacity to conform his conduct to the requirements of law was substantially impaired?

We agree that the trial judge applied an improper definition when considering the mitigating factor of youthful age, therefore, we will reverse the sentence and remand for a new sentencing hearing. We find no merit in Appellant's other two contentions.

## A. *MITIGATING FACTOR OF "YOUTHFUL AGE"*

Upon a finding of guilt in a capital murder case, the sentencing body is required to evaluate various circumstances when determining if a sentence of death shall be imposed. At the sentencing phase of this case, a bench trial, the trial judge weighed the aggravating and mitigating circumstances as set forth in Maryland Code (1957, 1992 Repl.Vol., 1994 Cum. Supp.), Article 27, § 413 [4] in considering whether a sentence of death was the appropriate penalty for Appellant. One of the mitigating factors to be considered is the "youthful age of the defendant at the time of the crime." Section 413(g)(5). During the hearing, while delivering his oral opinion, the trial judge stated, "Next, number five, the defendant was of youthful age at the time of the crime. **Taking the phrase 'youthful age' to refer to chronological age, and having considered the case law,** I find by a preponderance of the evidence that that circumstance likewise does not exist." (Emphasis added).

Appellant objects to the trial court's application of chronological age as the appropriate definition when considering the mitigating factor of youthful age. This Court has clearly rejected a pure chronological age approach when evaluating the youthful age mitigating factor. *Stebbing v. State,* 299 Md. 331, 367, 473 A.2d 903, 921 *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). As we recently explained in *Lovell v. State,* 347 Md. 623, 657, 702 A.2d 261, 278 (1997), there is now an absolute minimum age requirement of eighteen years at the time of the murder in order to be death eligible. At the time the General Assembly amended the statute to require the minimum age of eighteen it did not amend the mitigating circumstance of youthful age, thus giving support to our case law holding that "youthful age" is not measured solely by chronological age, but rather there are additional factors to be considered. In *White v. State,* 300 Md. 719, 738, 481 A.2d 201, 210 (1984), *cert. denied,* 470 U.S.

---

4. Hereinafter all statutory citations shall be to Md.Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Art. 27 unless otherwise specifically noted.

1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985), we defined the factors to be considered which include "prior criminal conduct, home environment, marital status, degree of maturity, and alcohol and drug abuse, among others, as factors relevant to the concept of youthful age."

Johnson's age at the time of the murder was nineteen years and two months. During the course of the sentencing hearing, substantial evidence was introduced demonstrating that Appellant was the product of extremely abusive parents, that he had a severe alcohol and drug abuse problem, that he was very poorly educated and that he lacked maturity. On the other hand, evidence was also introduced revealing that Appellant had a substantial prior criminal record and that he had a girlfriend.

■ As we have held, the burden is on the defendant to prove, by a preponderance of the evidence, the existence of a mitigating circumstance. *Stebbing v. State*, 299 Md. at 361, 473 A.2d at 918. In the instant case, it was the trial judge's responsibility to determine whether this burden had been met, upon a consideration of all of the factors to be considered in determining youthful age. Because the trial judge stated during his oral opinion that he equated youthful age with chronological age and no other factors were stated we must vacate the sentence and remand to the trial court for a new sentencing hearing.

Where a trial judge in a bench trial determines that the mitigating factor of youthful age has not been proven, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational sentencing authority could have concluded that the accused failed to prove the claimed mitigating circumstance by a preponderance of the evidence." *Id.* at 362, 473 A.2d 903. The sentencing authority is not required, as a matter of law, to find that the mitigating circumstance of youthful age exists under these circumstances. As we recently reiterated in *Lovell v. State*, 347 Md. at 656, 702 A.2d at 277 the holding in *Stebbing* does not compel the sentencing judge "to find the

mitigating circumstance of youthful age, under all of the circumstances, where the defendant was nineteen years of age at the time of the murder." Thus, on remand, the trial judge has the discretion to reach whatever conclusion he deems appropriate, consistent with this opinion, applying the factors cited herein.

■ The State asserts that even if the trial judge erred in restricting his consideration of the mitigating circumstance of youthful age to Johnson's chronological age, the issue is not preserved for appellate review. The State bases this contention on the fact that defense counsel did not object to the definition that was articulated by the trial judge while delivering his oral opinion during the sentencing phase. After all of the evidence is presented, the sentencing authority then evaluates the aggravating and mitigating circumstances in order to determine if a sentence of death is the appropriate penalty. After considering all of the evidence in this case, the trial judge articulated each circumstance and rendered his opinion as to whether or not the circumstance existed. Given the nature of the proceedings, defense counsel was not required to object. To do so would require that defense counsel interrupt the judge during his delivery of an oral opinion and make an argument as to his findings.

In the first instance, this Court is required under § 414(e) as follows:

"(e) *Considerations by Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals **shall** consider the imposition of the death sentence. With regard to the sentence, the court **shall** determine:

\* \* \*

■ (2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstances under § 413(d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances: and . . . . "

(Emphasis added).

This Court cannot fulfill its statutory obligation as outlined above if the sentencing authority does not properly evaluate the aggravating and mitigating circumstances. As we have explained, in this case the trial judge did not apply the correct definition when deciding that the mitigating circumstance of youthful age did not exist. Thus, it is not clear whether or not this may have had any greater weight when properly applied and when balanced against the aggravating circumstances. The enacted statutes outlining the procedures to be followed for the imposition of the death penalty in this State have been "structured to guide the discretion vested in the sentencing authority with 'clear and objective standards' to ensure that the death penalty is not inflicted in an arbitrary and capricious manner in violation of constitutional principles." *Johnson v. State*, 292 Md. 405, 437, 439 A.2d 542, 560 (1982). To that end, we are required to remand this case for a proper consideration of whether the mitigating factor of youthful age exists and, if so, whether the aggravating circumstances are outweighed by the mitigating circumstances.

The State further asserts that if the error did exist it was harmless beyond a reasonable doubt and therefore does not warrant vacating the sentence and remanding for a new sentencing hearing. We do not agree. We have repeatedly held that when an error is made as to a matter of law, the proper recourse is to remand for a new trial or hearing. In *Johnson*, we held that where, as here, the sentencing authority fails to comply with the statutory design we must vacate the sentence. *Id.* at 440, 439 A.2d at 562.

In *Maziarz v. State*, 302 Md. 1, 485 A.2d 245 (1984) we vacated a death sentence and remanded for a new hearing for reasons involving the weighing of aggravating and mitigating circumstances. In that case, the trial judge stated that "unless the mitigating circumstances are overwhelming, the death

penalty is mandated if any one of the aggravating circumstances is proven by the State." *Id.* at 5, 485 A.2d 245. We held that "[t]he standard applied by the trial court, whereby death is said to be 'mandated' unless the mitigating circumstances are 'overwhelming,' grossly distorts the statute to the prejudice of the accused. We must therefore vacate the death sentence and remand for new sentencing proceedings on the verdict of guilty under Count I of the indictment, the first degree murder count on which the State gave notice that it was seeking the death penalty." *Id.* at 6, 485 A.2d 245. The same reasoning applies to the instant case, where the failure to consider all factors relevant to the concept of youthful age is prejudicial to the defendant, thus requiring that we remand for a new sentencing hearing. *See also Sucik v. State,* 344 Md. 611, 689 A.2d 78 (1997) (A sentence of life without the possibility of parole was vacated and the case remanded for a new sentencing hearing based on the failure of the trial court to consider the findings contained in a presentence investigation report prior to imposing the sentence as the report was never prepared. We held that the PSI ensures that the sentence will be imposed only after all relevant considerations are assessed.)

## B. *VICTIM IMPACT EVIDENCE*

██ Appellant next asserts that the trial judge erred by admitting improper victim impact evidence and the victim survivors' opinions about Johnson and the appropriateness of the death penalty. The basis of appellants objection is that the victim impact statements were not *prepared* by the Division of Parole and Probation ("Division") and that the statements contained the opinions of the survivors that the death penalty was the appropriate sentence.

In this case, the sentencing authority was the trial judge, who clearly indicated that he was not considering the opinions as expressed in the statements but rather that his decision would be based on the evidence. The trial judge stated, "The sentence will not be decided based upon emotion or the opinions of victims, or the State, or the Defendant, but rather

on the evidence that's produced throughout this sentencing hearing." (T. 5/2/96 at 4–5). Although we need not address this issue because the trial judge recognized and corrected any potential problem thus rendering the admission of the opinions harmless beyond a reasonable doubt, we will comment for future guidance.

 Upon notice by the State that it intends to seek the death penalty or life without the possibility of parole, a presentence investigation must be conducted and a report prepared by the Division. The contents of this presentence investigation report ("PSI") must be considered by the sentencing authority before either sentence may be imposed. *See Sucik, supra.* The only victim impact statements admissible in a death penalty case are those contained in the PSI as required by Maryland Code (1957, 1997 Repl.Vol.) Article 41, § 4–609(d) which states:

> "In any case in which the death penalty or imprisonment for life without the possibility of parole is requested under Article 27, § 412, a presentence investigation, including a victim impact statement as provided under Article 27, § 781 of the Code, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or 413."

In *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996), the defendant objected to the introduction of two victim impact statements prepared by a friend and by a colleague of the two victims when they were offered by the prosecutor and were not made a part of the PSI. This Court agreed with the defendant that admission of the statements under those circumstances was improper. We held, "[o]ur interpretation of the statute is simply that the only written victim impact statements that are admissible in death penalty cases are those made a part of a PSI prepared by the Division of Parole and Probation as authorized by Art. 41, § 4–609(d)." *Id.* at 763, 679 A.2d 1106.

We have previously held that our statute does not require that the Division physically prepare the victim impact statements, rather "we believe that the legislature intended to limit the use of written victim impact statements in death penalty cases to those included in or incorporated as part of a PSI prepared by the Division of Parole and Probation." *Williams* at 764, 679 A.2d 1106. Recently, in *Ball v. State,* 347 Md. 156, 193, 699 A.2d 1170, 1187 (1997), we reaffirmed this position by again holding that the statute does not require the Division "prepare" victim impact statements but rather that they be "included" in the pre-sentence investigation report; therefore, attaching the statements at the end of the PSI is sufficient. Nevertheless, we will further comment on the issue in order to point out the impropriety of allowing victim impact statements to expound on the appropriate sentence for the defendant.

Both of these issues were recently addressed in *Ware v. State,* 348 Md. 19, 702 A.2d 699 (1997). In that case appellant objected to the admission of victim impact statements that were procured by the State's Attorney's Office and submitted to the Division of Parole and Probation for inclusion in the pre-sentence investigation report. Ware also attacked the substance of the written victim impact statements, claiming that they improperly contained family members' sentencing recommendations. The State agreed to redact those portions of the statements relating to the sentencing recommendations, recognizing the mandate of Art. 27, § 413(c)(iv) ("[A]ny recommendation as to sentence contained in the [PSI] report is not admissible...."). The state further agreed to exclude those statements not prepared by family members. *Id.* at ——, 702 A.2d at 720. The court admitted the statements as modified. This Court held that "neither § 4–609(d) nor our opinion in *Williams* dictates any particular person or agency as the responsible party for procuring the victim impact statements that ultimately become a part of the PSI." *Id.* at ——, 702 A.2d at 720.

## C. *IMPAIRED CAPACITY TO CONFORM CONDUCT*

██ Appellant next argues that the trial judge was clearly erroneous in failing to find that the murder was committed

while Appellant's capacity to conform his conduct to the requirements of law was substantially impaired, pursuant to § 413(g)(4) [5]. We disagree. As we have previously held the burden is on the accused to prove by a preponderance of the evidence any mitigating factor. *Tichnell v. State*, 287 Md. 695, 730, 415 A.2d 830, 848–849 (1980). The standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational sentencing authority could have concluded that the accused failed to prove the claimed mitigating circumstance by a preponderance of the evidence." *Stebbing v. State*, 299 Md. 331, 362, 473 A.2d 903, 918, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Appellant argues that the trial judge was clearly erroneous in failing to find that the mitigating circumstance existed because they introduced the testimony of psychiatric, psychological and neurological experts which supported that mitigating factor. The State, on the other hand, called only one witness, a psychiatrist, who disputed the Appellant's expert testimony. As we recently held in *Jones v. State*, 343 Md. 448, 460, 682 A.2d 248 (1996) "[i]n performing its fact-finding role, the trier of fact decides which evidence to accept and which to reject." We find that there was sufficient evidence for any rational trier of fact to find that the mitigating circumstance did not exist.

*JUDGMENT AS TO CONVICTIONS AFFIRMED, DEATH SENTENCE ON COUNT ONE OF THE CRIMINAL INFORMATION VACATED, SENTENCES ON OTHER COUNTS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR ALLEGANY COUNTY FOR A NEW SENTENCING HEARING ON COUNT ONE OF THE CRIMINAL INFORMATION.*

---

**5.** "(g) *Consideration of mitigating circumstances.*—...

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance."