809 A.2d 721

Sirena Catura WHITTINGTON,

v.

STATE of Maryland.

No. 1143, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Oct. 31, 2002.

498

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Jack Johnson, State's Atty. for

Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before HOLLANDER, JAMES R. EYLER and SONNER, JJ.

HOLLANDER, Judge.

In this case, we must consider the admissibility of a confession that was allegedly procured through deceptive police conduct involving representations during interrogation about a bogus scientific test. We must also determine whether the court erred by admitting in evidence the results of a voice stress test, and in barring the admission of certain psychiatric testimony.

A jury in the Circuit Court for Prince George's County convicted Sirena Catura Whittington, appellant, of the second degree murder of her husband, Andre Whittington. She was also found guilty of a handgun offense. Thereafter, the court sentenced appellant to consecutive terms of imprisonment totaling 50 years.

On appeal, Whittington poses three questions, which we have rephrased:

I. Did the trial court err in denying appellant's motion to suppress her confession?

II. Did the trial court err in admitting evidence at trial that appellant failed a voice stress analysis test?

III. Did the trial court err in ruling that appellant's board-certified psychiatrist could not render an opinion as to whether appellant's confession was voluntary?

For the reasons set forth below, we shall affirm.

## I. SUPPRESSION MOTION

### A. Factual Summary

On the morning of March 26, 1999, Andre Whittington was shot once in the back of the head at his office in Laurel. He died shortly thereafter. At trial, the State proceeded on the

theory that appellant shot the victim because she thought her husband "was being unfaithful to her and she was tired of it." The defense acknowledged that appellant shot her husband, but claimed she did so because she was a victim of spousal abuse. At the time, appellant was in her mid 20's, a mother of two children, and had completed one year of community college. She was one of many witnesses who testified at trial.

Prior to trial, appellant moved unsuccessfully to suppress the statements she made during custodial interrogation, one of which was a confession. At the suppression hearing held in February 2001, numerous witnesses testified. What follows is a summary of the evidence adduced at the hearing.

Detective Jeffrey Reichert contacted appellant by telephone shortly after 1:00 p.m. on March 26, 1999, the date of Mr. Whittington's death. Appellant told him she had dropped her husband off at work at around 7:50 a.m. that morning. Detective Reichert arranged to meet appellant at her home at 2:00 p.m. that afternoon. At the time, appellant was not yet a suspect in the murder. Appellant told the detective that she had driven her husband to work in her car, because the tires had been slashed on his car. She also gave an oral account of the events of the morning and the previous evening.

On March 29, 1999, three days after the murder, appellant went with her parents to the police station, at the request of the Prince George's County homicide unit. She arrived before 1:00 p.m. During the first eighteen hours that appellant was at the police station, she gave several statements, oral and written, denying any participation in the shooting. At about 7:00 a.m. on March 30, 1999, some eighteen hours after her arrival, appellant confessed to the homicide. The State introduced as an exhibit a "log" showing what transpired while appellant was at the police station.

At 12:50 p.m. on March 29, 1999, appellant was met by Detective Nelson William Rhone, Jr., who escorted her to an interview room. Detective Rhone described the room as 8 feet by 6 feet in size, with one desk, two chairs, a door, and carpeting. Appellant was not handcuffed or shackled, and

Rhone did not wear his handgun in the interview room. At the time of the interview, Detective Rhone already knew that a woman had been seen leaving her husband's place of employment after the gunshot.

According to Detective Rhone, appellant initially seemed somewhat "groggy," and "lethargic." She explained to him that the previous morning she had taken "half a pill" that her doctor had prescribed to help her sleep. The detective claimed, however, that as appellant spoke she seemed less lethargic. He then asked her some general biographical questions. At some point appellant told him that earlier that year she had been questioned by the police for misuse of credit cards and theft of computers. As to the computer theft incident, she told the detective that she had been advised of her rights and had given a statement.

Detective Rhone advised appellant of her rights beginning at 1:35 p.m., using the "long" waiver form. Appellant indicated that she understood her rights and initialed, checked, and signed the form.[1] According to the log, the advice of rights was completed at 1:45 p.m. Thereafter, appellant gave an oral statement as to the events of the night before and the morning of her husband's murder, in which she denied any involvement in his death.

At about 1:50 p.m., Detective Rhone gave appellant a pen to write her first statement; he left the room. Unknown to appellant, the detective put a powder on the pen that was invisible to the naked eye. The log states: "As a deceptive technique used, this investigator used a[n] orange finger print

---

1. The advice of rights form advised appellant that she had the right to remain silent; that anything she said could be used against her in court; she had the right to talk to a lawyer before she was asked any questions and to have a lawyer present during questioning; if she could not afford a lawyer and wanted one, a lawyer would be provided at no cost to her; and she had the right to stop the questioning at any time. Appellant checked the box and placed her initials next to the following statements: she understood each right; she wanted to make a statement without a lawyer; she had not been promised anything or threatened; and she was not under the influence of any substance.

powder on a black pen that would only show up under a neon or infrared light source."

Detective Rhone returned to the room at around 2:30 p.m. Upon reading appellant's written statement, he noted some "inconsistencies" in it. He then engaged in a question and answer interview of appellant, in which he asked her a series of questions to clarify her statement. The detective wrote the question, appellant wrote the answer, and she initialed each answer as well as each page.

At some point, the detective asked appellant whether she would consent to a test that would show whether she had "blow back" on her hands from recent handgun use. It was a bogus test, intended to trick appellant into believing that the police could determine whether she had recently fired a gun. Appellant consented to the test. The detective also asked appellant whether she would consent to a voice stress analysis ("VSA") test. Again, appellant agreed. According to Detective Rhone, at no time did appellant ask for an attorney or ask him to stop the interview. Moreover, he denied threatening appellant or making any promises to her.

At 3:10 p.m., appellant was taken to the restroom and then returned to the interview room. At about 4:00 p.m., an evidence technician entered the room to examine appellant's hands under an infrared light. He showed appellant the orange "powder" on her hands, stating that it was residue from a gun. It is undisputed that this was untrue; the orange powder came from the pen appellant had been given to write her statement.

Sergeant Glen Clark met with appellant between 4:25 p.m. and 5:15 p.m. Appellant agreed to submit to a voice stress "lie detector" test, which Sergeant Clark performed.

At 5:16 p.m., Detective Rhone entered the room and asked appellant if she would sign a consent form allowing the police to search her house in Baltimore. She agreed and executed the form. At 5:30 p.m., Detective Rhone offered appellant food and water, which she refused. She was left alone until 7:25 p.m., at which time Detective Christopher Brophy en-

tered the room. During her meeting with Detective Brophy, appellant requested and was given two cups of water. Detective Brophy did not take any statements from appellant, and he left the interview room at 8:30 p.m.

From 8:45 p.m. to 9:25 p.m., Detective Brophy and Detective Joseph Hoffman met with appellant. She was then left alone for an hour. Detective Hoffman again met with appellant from 10:30 p.m. until 1:00 a.m. Shortly thereafter, she was taken to the restroom and given some food. From 1:30 a.m. until 3:00 a.m., appellant met with Detective Joseph Bergstrom.

Detective Samuel Smith met with appellant at around 3:30 a.m. At 3:35 a.m. Detective Hoffman entered the room for the purpose of removing appellant's money and jewelry. Smith recalled that appellant asked, "how could the police arrest someone [if] they didn't have a gun?" She also asserted that "if she says something she's going to jail. If she does not say anything she's going to jail." He began a question and answer interview, writing both the questions and appellant's answers. Detective Smith left the room, then returned and finished the interview at 4:10 a.m. Appellant refused to sign or initial Smith's notes of her statement.

Detective Smith testified that while he met with appellant, she was alert and did not seem tired. Moreover, she never requested food or drink, did not ask to use the bathroom, and was not handcuffed. Further, Smith maintained that appellant did not request an attorney or ask to speak to her parents, nor indicate that she did not want to talk to the detectives. Smith was not in uniform.

Appellant was taken to the restroom at 4:20 a.m. Upon her return to the interview room, she spoke with Detective Robert Frankenfield. He described appellant as cooperative, and noted that she did not appear fatigued. In his view, appellant seemed bothered by something and wanted to talk. Frankenfield claimed that appellant never asked to speak to an attorney, nor did she decline to speak to him. Moreover, he did

not threaten or coerce her, nor did he wear a weapon while in the room with appellant.

Detective Frankenfield recalled that appellant told him about her marriage and discussed her belief that her husband was "cheating" on her. She also revealed that she had been subjected to verbal and physical abuse by her husband. At some point, appellant told Frankenfield, "you're trying to break me, you're trying to break me, and she started shaking her head[.]" Saying she was "so sorry," appellant then confessed to murdering her husband. She explained that when he hit her, called her names, and choked her, she just "snapped." Appellant claimed that she "didn't remember taking a gun out," but just "remembered him falling[.]"

At 7:00 a.m., Detective Frankenfield gave appellant some paper and told her to write down what she had said. He then left the room. At around 7:30 a.m., he brought her some food while she finished what is referred to as the third and final statement. Thereafter, he engaged in a question and answer interview. Appellant initialed each answer and signed each page. At some point they spoke about the "blow back" evidence, and she told him that she could not have any "blow back" on her hands because, after shooting her husband, she had washed her hands with bleach.

The police provided appellant with a mattress on which to sleep at around 11:00 a.m. At noon, appellant was taken to a dumpster in Baltimore, where she claimed to have thrown the gun. At about 4:00 p.m., the police permitted appellant to call her family. Appellant was taken before a commissioner at 5:00 p.m., twenty-eight hours after she arrived at the police station.[2]

Whittington presented a rather different version of her interrogation. She stated that when she met Detective Rhone at the police station she felt "woozy." She told him that she had taken a prescription medicine the night before to help her

---

2. Appellant does not complain about the delay in being brought before a police commissioner.

sleep. Detective Rhone had to steady her while escorting her to the interview room because her equilibrium was off.

Appellant asserted that Detective Rhone gave her an advice of rights form that already had check marks in the boxes. When she began to read the form, he told her that he knew she was in a hurry and showed her where to place her initials and signature. She then wrote a statement. After she finished, he took the statement and left the room for about fifteen minutes. When he returned, he slammed the paper on the table, told her that she was lying, and cursed at her. She also claimed that the detective "[j]acked" her "up by [her] collar." Appellant also maintained that she told the detective she wanted a lawyer, but he told her she could not afford a lawyer and that she would have to get a public defender. Although appellant claimed that she asked to see her parents, she said Rhone refused to allow her to do so. Appellant also claimed that she asked for water but was never given any.

According to appellant, she was never alone for more than twenty minutes. She recalled that, at one point, Detective Rhone left the interview room for about five minutes. When he returned, he told her she could go home after a question and answer session. Appellant said that when another officer entered, they started playing "good cop, bad cop." An officer asked her to take a "polygraph" test for "insurance purposes." The officer told her that it "wasn't admissible in court, so it didn't matter." Appellant agreed, and a man came in and performed the test. Although he told appellant that she had "passed" the test, another officer came in and said she had "failed miserably."

Appellant stated that at around 1:00 a.m., she was placed in handcuffs and shackles and taken to a restroom. When she was brought back, Detective Smith entered the room and told her that they were going to lock her up regardless of whether she talked. According to appellant, Detective Smith never asked her any questions about the murder and never took a statement from her. After Detective Smith left, another person asked her to "take a gunpowder residue test," and she

agreed. About seven officers were in the room. Some had "goggle things" on and told her to hold out her hands. Then, an officer "turned the lights off and said, 'oh, she got it' and turned the lights on."

At one point, according to appellant, Detective Frankenfield entered the room with another police officer. The detective pulled a gun from his side and repeatedly waved it in her face. She told him that he was frightening her, and she crawled onto the floor underneath the desk and cowered. Appellant claimed that she repeatedly told Detective Frankenfield that she wanted a lawyer but he told her that it was not necessary. He promised she would go home once she had written a statement. She began to write about her relationship with her husband, but then asked the detective what he wanted her to say. He told her he would "coach" her through the statement. She testified: "He basically coached me through this, because he had other statements with him[.]" Further, she explained that she was willing to write down what he said because she was "tired and fed up."

Although Detective Frankenfield gave appellant some food, she said she never ate it. Nevertheless, appellant claimed she was very hungry, as well as tired and cold. She said she repeatedly asked to call her family but the officers refused to allow her to do so. Moreover, she stated that she told the officers that she was tired, to no avail. According to appellant, she asked each officer for an attorney. She also claimed that she was shackled and in handcuffs most of the time.

On cross-examination, appellant admitted that earlier that year she was questioned by the police about the theft of some computers. At that time, she was advised of her rights, filled out an advice of rights form, and waived her rights.

The defense called Dr. Alan Brody, a psychiatrist, who testified as an expert. Approximately eleven months after the murder, he examined appellant for about four hours. Dr. Brody explained that he attempted to determine Ms. Whittington's "mental state" at the time of the interrogation, in order to "establish some sense of what she might have been

experiencing psychologically [and] emotionally." His purpose was to assess the voluntariness of appellant's custodial statements. In his evaluation, Dr. Brody considered appellant's history and reviewed her testimony at the suppression hearing.

Dr. Brody described appellant as "quite emotionally vulnerable, suggestable" at the time of the police interrogation, as well as "confused." In addition, he opined that, following her husband's death, appellant "was probably suffering from post-traumatic stress disorder," which was most "severe" in the period immediately after the death. At the relevant time, the doctor said appellant was "anxious and depressed," psychologically affected by the pills she had taken earlier, "sleep deprived," was told "false information" and was "intimidated by physical force." Further, Dr. Brody explained that sleep deprivation is "very significant" in assessing the voluntariness of a statement. He also pointed to the police deception about the blow back test as a factor in the analysis of voluntariness. The doctor concluded that appellant was "exhausted, frightened," and "under duress" when she gave her confession. Based on all these factors, Dr. Brody opined that appellant's confession was not voluntary.

Robert Phillips, M.D., Ph.D., a forensic psychiatrist, testified for the State as an expert in forensic psychiatry. In an effort to obtain "a very clear understanding of the way in which [appellant's] neuropsychological capacities functioned," and provide "a more accurate opinion regarding whether or not she had that capacity to waive her rights," Dr. Phillips reviewed numerous and varied documents relevant to the case; conducted "collateral interviews" of several of appellant's relatives; arranged for and reviewed psychological testing of appellant performed by a clinical forensic psychologist; interviewed several of the detectives involved in the interrogation; and interviewed appellant.

Dr. Phillips opined that there was "no evidence of any clinical phenomenon or diagnosis that would have impaired the defendant's capacity to give a free, knowing or voluntary

statement to police authorities at the time she was questioned." Moreover, Dr. Phillips stated: "There is simply nothing in my clinical evaluation that supports the notion she had lost the capacity to make a decision." In addition, he testified that appellant "absolutely, unequivocally did not or does not at this time suffer from anything that remotely resembles post-traumatic stress disorder." Indeed, in his view, at the time of the interrogation, "there was not one scintilla of evidence" that appellant was suffering from post-traumatic stress disorder. To the contrary, he was satisfied that, at the time of the interrogation, there was "really no clinical evidence" of "impairment of cognition." Rather, in his view, appellant was capable of "giving a free and voluntary waiver" of her rights. Based on the interview of appellant and his review of various documents, Dr. Phillips concluded that appellant was a "malingerer," in that she "distort[ed] facts for [her] own advantage."

Detectives Rhone, Smith, and Frankenfield were recalled in rebuttal. They denied that appellant's confession was the result of the use of handcuffs, shackles, force, promises, threats, inducements, intimidation, deprivation of food, or denial of bathroom breaks or sleep.

After the evidence was presented, appellant's trial counsel argued that the statements were involuntary. Although defense counsel conceded that it is generally permissible for the police to be "somewhat deceptive," he contended that in this case there was "coercion and duress in its classic form." Complaining about the length of interrogation, he asserted that the police used "classic terrorist tactics to get this woman to confess. . . ." In this regard, defense counsel pointed to physical threats, removal of appellant's possessions, "no bathroom," and no water. Moreover, he referred to her "groggy" condition caused by her medication. Further, he claimed that appellant was subjected to "constant stress" along with "deprivation of human essentials," including sleep. He added: "It is just not reasonable to think that being up for 18 straight hours . . . is not going to create some type of need for sleep or rest in any human." He concluded that, from the State's perspec-

tive, appellant was "smart enough to know what to do, [yet] dumb enough to confess, but only after 18 hours." Significantly, the defense lawyer did not contend that appellant's confession was involuntary because of deceptive police conduct in using a bogus scientific test.

In its ruling, the court expressly discredited appellant's version of events and credited the State's account. It found that appellant's statements were obtained in compliance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As to voluntariness, the court considered the defense's allegations of coercion and sleep deprivation, the undue length of the interrogation, and the conflicting expert testimony as to whether appellant suffered from post-traumatic stress syndrome. In a thorough and well reasoned oral opinion denying appellant's suppression motion, the court said:

> A statement given by a defendant is admissible only if three broad ... factors are met. It has to be voluntary under Maryland common law, voluntary under the due process clause of the 14th Amendment under federal law and under Maryland constitutional law as well, and it must be in conformance with the mandates of Miranda.
>
> In determining whether the defendant's statement is voluntary under both Maryland common law and the due process and the federal and state constitutions, the standard is the totality of the circumstances.
>
> The factors that I must consider include where the interrogation was conducted, its length, who was present, how it was conducted, its contents, whether the defendant was given her *Miranda* warnings, the mental and physical condition of the defendant. The age, background, experience, education, character, intelligence of the defendant, whether the defendant was taken before a court commissioner following arrest and whether the defendant was physically mistreated, physically intimidated or psychologically pressured. Those are the factors listed in *Hof* [*v. State,* 337 Md. 581, 596–97, 655 A.2d 370 (1995) ] . . . .

\* \* \*

I find that the statement was in fact made in compliance with *Miranda.*

As to whether or not the statement was voluntary, either under the Maryland common law or the federal and state constitutional law, basically the defense is twofold, that she confessed because she was sleepy, or she was so sleepy she would do anything to get sleep and that the length of the interrogation resulted in an involuntary statement.

Thrown into that was the diagnosis by Dr. Brody that he believes she suffered from post-traumatic stress syndrome, which he felt made her more vulnerable to questioning.

He based his opinion on the fact the interrogation took place in a small room, that she was handcuffed, that she was not permitted to go to the rest room, she was not permitted food, she was not permitted water, that there was deception on the part of the police, specifically as to the orange powder, and lastly, that she was sleep deprived.

The detectives testified that she was not handcuffed, that she was permitted to go to the rest room, she was permitted food, she was permitted water, she was offered food and water, which she refused. *So I believe the collective version of the detectives. I do not believe Miss Whittington.* Therefore, obviously I'm not going to consider those factors.

\* \* \*

The deception on the part of the police is constitutionally permitted. The police are permitted to lie. They are permitted to deceive in their efforts to obtain the truth.

That leaves us with the sleep deprivation. Dr. Brody testified that the sleep deprivation can cause hallucinations, it causes losing touch with reality, psychotic episodes. Obviously, that is the very extreme case, and I did not infer from his testimony in that regard that he was saying that occurred in this case.

On the other hand, Dr. Phillips testified, and testified that there's sleep deprivation and then there is sleep deprivation.

As part of anyone becoming a doctor, they're working 48 hour shifts, 36 hour shifts. The issue is not whether her normal night's sleep was interrupted, which certainly it was, or not even that she was tired. The issue is did the loss of sleep make her lose her capacity to make decisions.

I find that it did not. Dr. Phillips testified that you would see a broad array of dysfunction and other aspects of behavior if someone was in fact suffering from sleep deprivation, and I believe his testimony.

The other factor I'm considering is the statements themselves. I've looked at the statement that was given in the afternoon. I've read that. I read the statement that was given at 7 a.m., and there appears to me to be absolutely no difference in those statements in terms of how they're constructed. The sentence structure is beautiful. Obviously, we're dealing with an educated person. The sentences are the same. The handwriting appears to be the same. The spelling is great. That statement looks in no way—that statement was not written by someone who had any lack of capacity to make that statement.

As between the two, I think it's clear already *I believe Dr. Phillips.* I believe his testimony was not only the most credible, it was the one that was based on the proper standards and the proper foundations. He had tests run, he obtained all the information, so he had a background, and he found there was no evidence of any clinical condition that would have impaired her capacity to freely and voluntarily make the statement.

There was no evidence of any post-traumatic stress, and that the sleep deprivation was simply not a factor. There was no indication that she lost her capacity to make any decisions based on the lack of sleep.

(Emphasis added).

We shall include additional facts in our discussion.

## B. DISCUSSION

 In appellant's challenge to the denial of her motion to suppress, she focuses primarily on deceptive conduct by the

police in using a phony "blow back" test.[3] Although appellant concedes that the court was "free to believe" the State's evidence, in which the police denied any mistreatment or deprivation of appellant's right to counsel, Whittington contends that the deceptive police conduct constituted psychological inducement or coercion. Consequently, she insists that her confession was involuntary and inadmissible. Whittington asserts:

> [T]he State freely confirmed its effective use of a particular form of deception which was so extreme that it was coercive and intolerable. The use of a false, gunshot residue 'test,' coupled with use of a police technician to falsely validate the phony test results, crossed a line into impermissible deception. That level of deception was combined with the use of a 'voice stress test,' which is even less scientifically reliable than the inadmissible polygraph test, but which was touted to the accused as a lie detector. Finally, these stress factors, were combined with the length of the interrogation—14 out of 28 hours spent in police custody, while three detectives took turns questioning her—to form a type of coercion so severe that it did 'break' the Appellant and coerce her admissions.

Appellant adds:

---

3. As we noted, at the motion hearing the defense did not rely on a claim of deceptive police conduct based on bogus scientific testing. Instead, defense counsel complained about various aspects of the interrogation, including the length of the interrogation and appellant's sleep deprivation. The defense also pointed to appellant's mental state. When appellant was asked at the hearing why she eventually wrote what she was told by Detective Frankenfield, she testified: "I was tired and fed up. One came in with a gun. What's next? I was tired." Similarly, asked why she wrote the portion of the statement describing the "incident," appellant said: "Because I just wanted to go home and go to sleep. I just wanted to leave. They told me I could leave if I just wrote this one last thing. They told me I could go."

In any event, the State does not argue lack of preservation with respect to appellant's claim on appeal about police deception. Nor does the State suggest that any portion of appellant's interview at the police station was non-custodial. Therefore, we shall assume that the issue of coercion based on police deception is properly before us.

The detectives' conduct in the case *sub judice* far exceeds law enforcement tactics allowed in previous Maryland cases. The detectives here continuously confronted Appellant with the false claim that they possessed indisputable, scientific and lie detector evidence of her guilt. This method is far more coercive than merely representing to the suspect that another has implicated her. Defense lawyers can cross examine witnesses, whose motives to lie can be exposed. But scientific test results, as the detectives in this case claimed to have, cannot be so easily attacked.

In response, the State asserts: "Deception about constitutional rights is qualitatively different than deception about the amount of evidence available to police." As to appellant's constitutional rights, it maintains that the police did not resort to deception.

■ When, as here, the prosecution seeks to introduce a defendant's custodial admission, the State must establish, by a preponderance of the evidence, that the statement was obtained in conformance with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[4] *See Hoey v. State*, 311 Md. 473, 480, 536 A.2d 622 (1988). The State also bears the burden of establishing that the incriminating statement was made voluntarily under Maryland nonconstitutional law, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article 22 of the Maryland Declaration of Rights. *See Hof v. State*, 337 Md. 581, 597–98, 655 A.2d 370 (1995); *Hoey*, 311 Md. at 480, 536 A.2d 622; *see also Colorado v. Connelly*, 479 U.S. 157, 166–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Pappaconstantinou v. State*, 352 Md. 167, 172–73, 721 A.2d 241 (1998).

■ To be sure, "the ultimate issue of 'voluntariness' [of a confession] is a legal question. . . ." *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *see also*

---

4. Because appellant does not contend that the police failed to comply with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we shall not address that matter.

*Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Baynor v. State,* 355 Md. 726, 729 n. 1, 736 A.2d 325 (1999); *Hof,* 337 Md. at 605, 655 A.2d 370. Therefore, we conduct a *de novo* review of the trial court's resolution of the voluntariness issue, based on the record presented at the suppression hearing.

 Our review of the trial court's ruling with respect to a suppression motion "ordinarily is limited to information contained in the record of the suppression hearing." *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *see Nathan v. State,* 370 Md. 648, 659–60, 805 A.2d 1086 (2002); *In re David S.,* 367 Md. 523, 529, 789 A.2d 607 (2002); *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420 (2001). We extend great deference to the fact finding of the motion court, and accept the facts as found, unless clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *see Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999); *State v. Fernon,* 133 Md.App. 41–44, 754 A.2d 463 (2000); *Charity v. State,* 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000) ("[w]hen conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that those findings were clearly erroneous.") This means that we give due regard to the motion judge's opportunity to assess the credibility of the witnesses. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Fernon,* 133 Md.App. at 43, 754 A.2d 463. Moreover, we review the evidence in the light most favorable to the prevailing party. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *see Charity,* 132 Md.App. at 606, 753 A.2d 556.

Nevertheless, as we indicated, this Court must make its own independent constitutional appraisal as to the admissibility of a confession by reviewing the law and applying it to the facts of the case. *Crosby v. State,* 366 Md. 518, 526, 784 A.2d 1102 (2001); *Wilkes,* 364 Md. at 569, 774 A.2d 420; *Facon v. State,* 144 Md.App. 1, 20, 796 A.2d 101, *cert. granted,* 369 Md. 570, 801 A.2d 1031 (2002); *Jones v. State,* 111 Md.App. 456, 466, 681 A.2d 1190, *cert. denied,* 344 Md. 117, 685 A.2d 451

(1996)(*citing Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). We accomplish this by reviewing the law and applying it to the first-level facts found by the suppression judge. *In re Tariq A–R–Y,* 347 Md. 484, 488–89, 701 A.2d 691 (1997), *cert. denied,* 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998); *Howard v. State,* 112 Md.App. 148, 156, 684 A.2d 491 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997).

As we consider the voluntariness issue, we are mindful that "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him [or her]....' " *Fulminante,* 499 U.S. at 296, 111 S.Ct. 1246 (quoting *Bruton v. United States,* 391 U.S. 123, 139, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). As the Supreme Court recognized in *Fulminante,* a confession is significant because " '[t]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information.... Certainly, confessions have profound impact on the jury....' " *Fulminante,* 499 U.S. at 296, 111 S.Ct. 1246 (quoting *Bruton,* 391 U.S. at 140, 88 S.Ct. 1620) (White, J., dissenting).

Appellant relies primarily on *State v. Cayward,* 552 So.2d 971 (Fla.Dist.Ct.App.1989), *review dismissed,* 562 So.2d 347 (Fla.1990), to support her contention that police deception in using a bogus scientific test rendered her confession involuntary. In *Cayward,* a teenager was suspected of sexually assaulting and smothering his young niece. During a two-hour interrogation, the police showed the suspect two scientific reports that had been fabricated as a ploy to induce a confession. *Id.* at 972. One report was prepared on stationery of the Florida Department of Criminal Law Enforcement; the other was prepared on stationery of Life Codes, Inc., a phony scientific testing organization. The police represented to the suspect that both scientific reports were genuine, and indicated that the test results revealed that Cayward's semen was found on the victim's underwear. *Id.* At the end of the interrogation, Cayward asked, "What happens now?" The

investigator told him, "We are going to the grand jury," and indicated that the State would seek the death penalty. *Id.* Cayward then confessed. Concluding that the fabrication of the documents and exhibition of them to the suspect violated the defendant's due process rights, the appellate court determined that the defendant's statement was involuntary. Thus, it upheld the trial court's suppression of the confession. *Cayward,* 552 So.2d at 972.

The Florida court acknowledged that deceptive police conduct does not render a confession involuntary *per* se. Although the *Cayward* court recognized the viability of the "totality of the circumstances" test in regard to the determination of voluntariness, it found that there was "a qualitative difference" between the use of verbal "artifices" and the fabrication of bogus documents. *Id.* at 973. Thus, the court adopted a "bright line" rule, stating that the manufacture and use of false documents by the police to induce a confession "has no place in our criminal justice system." *Id.* at 974.

The *Cayward* court recognized that, because most people expect police interrogations to take place in a confrontational or adversarial atmosphere, a suspect would probably expect the police to engage in some form of oral deception. In contrast, the court indicated that neither the expectations of the suspect nor the public "encompass the notion that the police will knowingly fabricate tangible documentation...." *Id.* In the court's view, such police conduct was reminiscent of "the horrors of less advanced centuries in our civilization when magistrates ... schemed with sovereigns to frame political rivals." *Id.* Indeed, the court regarded such conduct as analogous to "one of the parade of horrors" that our "modern judicial system was designed to correct." *Cayward,* 552 So.2d at 974. Therefore, it concluded that "the manufacturing of false documents by police officials offends our traditional notions of due process of law...." *Id.*

In reaching its decision, the Florida court reasoned that, unlike oral misrepresentations, manufactured documents have "the facial appearance of authenticity." *Id.* Moreover, the

court expressed concern that such documents might find their way into official files and even the courtroom. In its view, the erroneous admission of false documents would diminish the public's confidence in both the police and the legal system. *Id.* at 975. *See also State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50, 60 n. 13 (1994) (agreeing with *Cayward's* holding distinguishing between police deception generally, and the manufacture of false documents by the police).

Analogizing to *Cayward,* appellant argues here that "the police not only used verbal lies, but they manufactured tangible, false scientific evidence, by using a powder [sic] surreptitiously placed on the hands of the accused. Then, they even involved a police 'evidence technician,' a black light, and goggles to show the accused that a bright orange powder was on her hands, supposedly conclusive, scientific proof that she had fired a gun and there was 'the blow back from the gun' glowing bright orange on her hand."

We reject Whittington's contention that police deception with regard to the use of bogus scientific procedures is inherently more coercive than other forms of deception. At the outset, we note that there are important distinctions between this case and *Cayward.* The test results in *Cayward* clearly induced the defendant to confess. In contrast, appellant did not immediately confess when she learned of the results of the "blow back" gun test. Moreover, the court's decision in *Cayward* was partly rooted in its deep concern about the potential for misuse of a written memorialization of a fake scientific test, as well as the "indefinite life" of such documentary evidence. In this case, however, no documents were fabricated, so the concerns of the *Cayward* court are not implicated.

A confession is generally voluntary if it is " 'freely and voluntarily made at a time when [the defendant] knew and understood what he was saying.' " *Hoey,* 311 Md. at 481, 536 A.2d 622 (citation omitted). Conversely, "a confession is involuntary if it is induced by force, undue influence, improper promises, or threats." *Id.* at 483, 536 A.2d 622. Thus, under

Maryland nonconstitutional law or common law, a confession or inculpatory statement will be suppressed if the conduct of the police has overborne the defendant's will to resist and produces a statement that was not freely self-determined. *Ball v. State*, 347 Md. 156, 178–79, 699 A.2d 1170 (1997), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). Put another way, a custodial statement is inadmissible unless it is " 'shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary.' " *Burch v. State*, 346 Md. 253, 266, 696 A.2d 443, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997) (quoting *Hillard v. State*, 286 Md. 145, 150, 406 A.2d 415 (1979)); *see In re Joshua David C.*, 116 Md.App. 580, 598, 698 A.2d 1155 (1997). Coercion may be physical or psychological. *See State v. Kidd*, 281 Md. 32, 36, 375 A.2d 1105, *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

■■■ Ultimately, the voluntariness of a statement turns on "the totality of all of the attendant circumstances." *Burch*, 346 Md. at 266, 696 A.2d 443; *see Winder v. State*, 362 Md. 275, 307, 765 A.2d 97 (2001); *Gilliam v. State*, 320 Md. 637, 650, 579 A.2d 744 (1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). In *Hof*, the Court explicated the factors relevant to the "totality of the circumstances" standard. The factors include

> where the interrogation was conducted; its length; who was present; how it was conducted; its content; whether the defendant was given Miranda warnings; the mental and physical condition of the defendant; the age, background, experience, education, character, and intelligence of the defendant; when the defendant was taken before a court commissioner following arrest; and whether the defendant was physically mistreated, [or] physically intimidated or psychologically pressured.

*Hof*, 337 Md. at 596–97, 655 A.2d 370 (citations omitted). Although there are many relevant factors, courts must consider the particulars of each case. *Cf. United States v. Arvizu*,

534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (recognizing that determination of reasonable suspicion requires consideration by courts of "the 'totality of the circumstances' of each case....").

In determining the voluntariness of a confession under the federal Constitution and the Maryland Declaration of Rights, the Supreme Court's decision in *Colorado v. Connelly, supra,* 479 U.S. 157, 107 S.Ct. 515, provides guidance. There, the Supreme Court held that "coercive police activity" is a necessary element to finding a confession involuntary. *Id.* at 167, 107 S.Ct. 515. The Court stated: "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164, 107 S.Ct. 515 (footnote omitted). A contrary rule, the Supreme Court reasoned, would require "sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State." *Id.* at 167, 107 S.Ct. 515.

To be sure, the use of police deception is a proper consideration in regard to voluntariness. Indeed, courts have suppressed statements found to be the product of excessively deceptive conduct. *See, e.g., United States v. Tarlowski,* 305 F.Supp. 112, 124 (E.D.N.Y.1969) (focusing on law enforcement's trickery in obtaining inculpatory information from a suspect; suppressing statement because federal agent deceived the accused into believing that he was the subject of civil litigation rather than a criminal investigation); *Alexander v. United States,* 390 F.2d 101, 110 (5th Cir.1968) (recognizing that, "[i]n order for the response to be free, the stimulus must be devoid of mendacity."), *appeal after remand,* 431 F.2d 83 (5th Cir.1970); *United States v. LaVallee,* 285 F.Supp. 233, 239 (S.D.N.Y.1968) (finding that prosecutor's deception was decisive factor that "tip[ped] the scales against the State"), *aff'd,* 417 F.2d 411 (2d Cir.1969).

Nevertheless, the use of trickery to encourage a suspect to confess is not inherently unlawful. *See Frazier v.*

*Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). Thus, the use of deception does not *compel* suppression, any more than would the use of promises, threats, or inducements, although it is certainly a factor in regard to voluntariness. As the Court indicated in *Ball,* 347 Md. 156, 699 A.2d 1170, trickery and deception are ordinarily regarded as legitimate investigative techniques. There, the Court said:

> A person who has committed an illegal act [ ] is not always eager to admit his or her wrongdoing. Police officers, charged with investigating crimes and bringing perpetrators to justice, are permitted to use a certain amount of subterfuge, when questioning an individual about his or her suspected involvement in a crime. As the Court of Special Appeals has observed, "[d]eception short of an overbearing inducement is a 'valid weapon of the police arsenal.' "

*Ball,* 347 Md. at 178, 699 A.2d 1170 (citations omitted).

In *West v. State,* 124 Md.App. 147, 158, 720 A.2d 1253 (1998), *cert. denied,* 353 Md. 270, 725 A.2d 1068 (1999), for example, we observed that the use of voice stress tests or lie detectors to produce a psychological effect on a suspect to obtain relevant facts does not, as a matter of law, require exclusion of a resulting statement. Rather, we looked to the totality of circumstances to determine if the defendant's will was overborne by aggressive police tactics. Similarly, we recently reiterated that the police may "exaggerate the evidence they have accumulated against the person being interviewed," and they may tell a person that "he or she is only a witness, when, in fact, the person is a suspect." *Minehan v. State,* 147 Md.App. 432, 442, 809 A.2d 66 (2002) (citing *Oregon v. Mathiason,* 429 U.S. 492, 495–96, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)).

*Finke v. State,* 56 Md.App. 450, 468 A.2d 353 (1983), *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416, 299 Md. 425, 474 A.2d 218 (1984), is also instructive. There, the defendant challenged police conduct during his interrogation, pointing to various lies by the police, such as false representa-

tions that he had failed a polygraph, false assertions that there were eyewitnesses to the crime, and a bogus claim that his fingerprints were found at the crime scene. The Court recognized that " 'the use of trickery by the misrepresentation to the accused of the evidence that the police possessed is ... within the ambit of ... "other proper investigative efforts" ....' " *Id.* at 490 (citations omitted).

Moreover, the *Finke* Court found no constitutional significance in the difference between such assertions and the ploy of telling a suspect that an accomplice confessed, as sanctioned in *Hopkins v. State,* 19 Md.App. 414, 311 A.2d 483 (1973), *cert. denied,* 271 Md. 738 (1974). In *Hopkins,* this Court said: "We hold that the use of trickery by the misrepresentation to the accused of the evidence that the police possessed is, under the circumstances of this case, within the ambit of the 'other proper investigative efforts' recognized by *Escobedo [v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) ]." *Id.* at 424, 311 A.2d 483 (footnote omitted). *See Rowe v. State,* 41 Md.App. 641, 645, 398 A.2d 485 ("[I]t is not unconstitutional to entice confessions deceptively"; "Deception short of an overbearing inducement is a 'valid weapon of the police arsenal' "), *cert. denied,* 285 Md. 733 (1979); *Watkins v. State,* 59 Md.App. 705, 718, 478 A.2d 326 (1984) (asserting that mere fact that officer's deceit motivated accused to make inculpatory statement did not render statement involuntary).

Decisions of courts in other jurisdictions suggest that the use of deception by the police during interrogation does not compel a finding of involuntariness. *See, e.g., Springer v. Commonwealth,* 998 S.W.2d 439, 445–47 (Ky.1999) (finding that confession was not involuntary despite police ruse, in which police falsely used videotape to convince woman accused of murdering her husband that her calls had been monitored); *State v. Register,* 323 S.C. 471, 476 S.E.2d 153, 158 (1996), *cert. denied,* 519 U.S. 1129, 117 S.Ct. 988, 136 L.Ed.2d 870 (1997) (rejecting defendant's due process claim based on false assertions that tire and shoe prints matched and that police had DNA evidence establishing accused's guilt); *Arthur v. Commonwealth,* 24 Va.App. 102, 480 S.E.2d 749, 752 (1997) (reject-

ing argument that "dummy" DNA reports rendered confession involuntary; declining to draw bright line prohibition because false documents were used); *Norfolk v. Houston*, 941 F.Supp. 894, 902 (D.Neb.1995) (holding statement voluntary when officer pretended to be looking at autopsy report); *Swann v. State.*, 247 Va. 222, 441 S.E.2d 195, 202(Va.) (police officer's misrepresentation that "Retinal Image Machine" could reveal last image seen by victim did not invalidate confession), *cert. denied*, 513 U.S. 889, 115 S.Ct. 234, 130 L.Ed.2d 158 (1994); *State v. Kelekolio*, 74 Haw. 479, 849 P.2d 58, 74 (1993)(rejecting bright line rule barring use of false document); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.1992), *cert. denied*, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993)("Of the numerous varieties of police trickery, . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.")

Nonetheless, the police are not without restrictions in their use of deceptive tactics. In *Lewis v. State*, 285 Md. 705, 722, 404 A.2d 1073 (1979), the Court of Appeals said that "there are limits to the type of police deception which will be tolerated without rendering a confession involuntary." More recently, in *Winder v. State*, 362 Md. 275, 305, 765 A.2d 97 (2001), the Court stated:

> While we permit the police to make appeals to the inner conscience of a suspect and use some amount of deception in an effort to obtain a suspect's confession . . . when the police cross over the line and coerce confessions by using improper threats, promises, inducements, or psychological pressures, they risk loss of the fruits of their efforts.

*Winder*, 362 Md. 275, 765 A.2d 97, provides guidance to us. In that case, the defendant had been sentenced to death following convictions on three counts of first degree murder. On appeal, the defendant claimed that his confession was involuntary because it was obtained at the end of a twelve-hour interrogation conducted by four members of the State police, and "was the product of improper threats and promises made by the police. . . ." *Id.* at 306, 765 A.2d 97. The Court agreed.

In analyzing the defendant's contentions, the Court in *Winder* "gleaned" a two-part test from *Hillard*, 286 Md. 145, 406 A.2d 415, with respect to inducement. *Winder*, 362 Md. at 309, 765 A.2d 97. The Court stated that a confession is involuntary, and thus inadmissible, if:

1) a police officer ... promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and

2) the suspect makes a confession in apparent reliance on the police officer's statement.

*Id.* (citing *Hillard*, 286 Md. at 151, 406 A.2d 415).

The *Winder* Court explained, at 362 Md. at 310, 765 A.2d 97: "The State shoulders the burden of establishing, by a preponderance of the evidence, that the suspect's confession or inculpatory statement was not made in reliance on a promise or inducement made by a police officer or agent of the police." Then, it is the trial court's responsibility to determine whether a threat or inducement was made, and whether it had the effect of actually influencing the defendant. *Johnson v. State*, 348 Md. 337, 350, 703 A.2d 1267 (1998).

As to the second prong, the *Winder* Court observed that, without reliance on the interrogator's comments, there is no fatal inducement. *Winder*, 362 Md. at 309–10, 765 A.2d 97. The "second prong of the *Hillard* test triggers a causation analysis to determine whether there was a nexus between the promise or inducement and the accused's confession." *Id.* at 311, 765 A.2d 97. Applying the test to the facts and circumstances before it, the *Winder* Court concluded that the defendant's confession had been improperly induced by the police.

Significantly, even if a confession is obtained by the police through the use of trickery or deception, *Winder* does not discard the totality of circumstances analysis in favor of a bright line or *per se* exclusionary rule. Indeed, in our view, the bright line test urged by appellant is at odds with the rationale of the "totality of the circumstances" analysis. Under the totality of circumstances analysis, the fake gun shot

residue test was one factor, among many, relevant to voluntariness.

■■■ Our factual recitation demonstrates that the motion court was presented with conflicting testimony from the police and the defense as to many important factors pertinent to the issue of voluntariness. In this regard, "[w]eighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact-finder." *Bayne v. State,* 98 Md.App. 149, 155, 632 A.2d 476 (1993); *accord Marr v. State,* 134 Md.App. 152, 178, 759 A.2d 327 (2000), *cert. denied,* 362 Md. 623, 766 A.2d 147 (2001); *Hall v. State,* 119 Md.App. 377, 393, 705 A.2d 50 (1998); *Hunter v. State,* 110 Md.App. 144, 163, 676 A.2d 968 (1996). The court expressly credited the testimony of the detectives as to what transpired during the interrogation, as it was entitled to do. *See Grant v. State,* 230 Md. 384, 386, 187 A.2d 319 (1963). Viewing the evidence in the light most favorable to the State as the prevailing party, we perceive no error in the trial court's factual findings or legal conclusions.

Appellant was not under arrest when she first arrived at the police station. She was promptly given *Miranda* warnings and waived her rights. Moreover, she was not a novice to the criminal justice system; she had been given *Miranda* warnings and waived them earlier that year in an unrelated case. At the time in question, appellant was already in her mid-twenties and had completed one year of community college. Although appellant apparently was groggy when she first appeared at the police station, due to her medication, Detective Rhone's testimony indicated that her condition improved rather quickly. *See Hof,* 337 Md. at 597, 655 A.2d 370 ("Although being under the influence of narcotics does not automatically render a confession involuntary, it is certainly a factor to be considered. . . ."); *Hopkins,* 19 Md.App. at 423, 311 A.2d 483 ("A confession is not inadmissible as evidence merely because the accused is under the influence of a narcotic drug, although the condition of the accused is a factor to be considered.")

Although appellant was in police custody for twenty-eight hours before she was brought before a commissioner, she confessed after about eighteen hours. Nor was she subjected to continuous interrogation for eighteen hours. In any event, the duration of the interrogation is not dispositive. We have recognized that the "sheer passage of time with repeated questioning ... is essential to the majority of [police] interviews." *West,* 124 Md.App. at 158–59, 720 A.2d 1253.

*Marr,* 134 Md.App. 152, 759 A.2d 327, is instructive as to the length of the interrogation. There, the defendant was held for over thirty-five hours and, in that time, he was questioned for a total of fourteen hours. We concluded, however, that the statement was voluntary because "[t]he tactics were not overbearing...." *Id.* at 165, 759 A.2d 327. We noted that the defendant had been provided with food, drink, the opportunity to use the bathroom, and was not in any apparent discomfort. Similarly, appellant was questioned for a comparable amount of time, was offered food and water five times, and used the facilities four times.

In addition, although Whittington was interviewed by six police officers, only one officer was in the interview room with her at a time, except for one forty-five minute period when two officers were present. The officers testified that they did not threaten appellant, nor did they promise her anything to induce her to confess. Further, they were not wearing uniforms and did not wear their guns in the interview room. They also claimed that appellant was handcuffed only after she had confessed.

Significantly, the court found that appellant was not so exhausted at the time of the confession as to lose her ability to think. It based that finding on a comparison of appellant's first and last written statements. In the court's view, appellant's handwriting, sentence structure, and organization were as well-formed when she confessed as when she was first interviewed.

We also conclude that appellant failed to satisfy the second prong of *Winder.* Whittington has not referred us to any

portion of her testimony where she claimed, directly or indirectly, that she relied on police deception in making her confession. The evidence showed that the bogus scientific test was administered about three hours after appellant arrived at the police station. The confession did not occur for another fifteen hours. Thus, appellant's will was not overborne by the phony scientific test.

Like *Winder, Johnson v. State*, 348 Md. 337, 703 A.2d 1267 (1998), underscores the importance of a temporal connection between the alleged improper inducement and the incriminating statement. There, the defendant was told that if he confessed to the crime, he might receive medical treatment instead of being "locked up for the rest of [his] life and the key thrown down the sewer." *Id.* at 348, 703 A.2d 1267. The Court of Appeals agreed with the trial court's determination that these statements were "very likely" improper inducements. *Id.* at 350, 703 A.2d 1267. Nevertheless, the Court rejected the defendant's claim of involuntariness, because three days elapsed between the time of the improper remarks and the incriminating statement, and the lapse demonstrated that the disputed statement was not induced by improper police conduct. *See also Stokes v. State*, 289 Md. 155, 159–60, 423 A.2d 552 (1980) (concluding that defendant relied on a promise of help by the police because, after hearing the promise, he immediately revealed the location of the narcotics); *Ralph v. State*, 226 Md. 480, 485, 174 A.2d 163 (1961) (concluding that defendant did not rely on inducement because eight hours elapsed between inducement and incriminating statement), *cert. denied*, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962).

The voluntariness of a confession requires fact-intensive analysis. Under the specific facts of this case, that analysis was conducted; we perceive no error in the court's ruling.

## II.

■ Appellant argues that the trial court erred when it admitted evidence at trial that she had failed a voice stress analysis test. The State responds that, under the circum-

**528**

stances of this case, the trial court properly exercised its discretion to admit the evidence to rebut Whittington's claim of coercion and her allegations of police misconduct, and to show "that the police were not being deceitful, as had been the case with the faked gun residue test."

In *Smith v. State*, 31 Md.App. 106, 119, 120, 355 A.2d 527 (1976), we held that evidence of the results of a voice stress test are inadmissible because the results are unreliable. We likened the voice stress test to a polygraph test, as both require operators to determine, based on human physiological responses, whether the subject is telling the truth.

It is well settled that neither evidence that a polygraph test was taken nor the results of the test are admissible in a criminal proceeding.[5] *Guesfeird v. State*, 300 Md. 653, 658–59, 480 A.2d 800 (1984). Indeed, the mere mention of the words "polygraph test" is regarded as so damaging in a criminal prosecution that it has been referred to as a "pariah." *State v. Hawkins*, 326 Md. 270, 275, 604 A.2d 489 (1992). We continue to adhere to the view that because a VSA test is akin to a lie detector test, the law regarding the admissibility of polygraphs applies equally to a VSA test. *See* Thomas R. Malia, Annotation, *Admissibility of Voice Stress Evaluation*

---

5. In *Murphy v. State*, 105 Md.App. 303, 310 n. 2, 659 A.2d 384 (1995), the Court cited a commentator's explanation for why polygraphs differ from other accepted fields of criminology.

 "A study of the theory and process of the polygraph examination reveals complexities not present in the fields of fingerprint, handwriting, voice print, ballistics, and neutron activation analysis, all of which are based on the identity or behavior of physical phenomenon. The experts and studies differ as to the capability of the polygraph industry to cope with these complexities, but none would dispute their existence. The distinction is that polygraphy, albeit based on scientific theory, remains an art with unusual responsibility placed on the examiner. The acquainting of the examiner with the subject matter is often a source of improper suggestion, conscious or subconscious. The preparation of the test and discussion with the examinee of the polygraph procedure furnishes additional opportunity for improper subjective evaluation. The construction of the examination further proliferates controversy, for while experts may agree that a particular examination was inconclusive, they often do so for different reasons."

*Test Results or of Statements Made During Test,* 47 A.L.R.4th 1202, 1205–06 (1986, 2001 Supp.).

■■ Nonetheless, a limited exception to the rule barring admissibility arises when the voluntariness of a confession is an issue at trial and the test administration is relevant to voluntariness. *See Johnson v. State,* 303 Md. 487, 513, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Murphy v. State,* 105 Md.App. 303, 311–12, 659 A.2d 384 (1995); *Mitchell v. State,* 51 Md.App. 347, 353, 443 A.2d 651, *cert. denied,* 459 U.S. 915, 103 S.Ct. 227, 74 L.Ed.2d 180 (1982). This is because in determining the voluntariness of a confession, the jury is entitled to have before it all of the evidence relevant to the issue. *Mitchell,* 51 Md.App. at 350–51, 443 A.2d 651. In this regard, a polygraph test is considered "no different than any 'other potentially coercive condition, person or device present during interrogation.' " *Murphy,* 105 Md.App. at 311, 659 A.2d 384 (*quoting Johnson v. State,* 31 Md.App. 303, 309, 355 A.2d 504 (1976)).

■■ Although evidence of the administration of a polygraph test is admissible under limited circumstances, evidence of the *results* of the test, or the accused's refusal to take the test, is generally considered prejudicial and inadmissible. *Johnson,* 31 Md.App. at 307–08, 355 A.2d 504. We have said:

> We foresee very few circumstances under which the "results" of a polygraph test would ever be admissible. The potential for prejudice resulting from the jury knowing whether a defendant passed or failed a polygraph test would far outweigh any probative value that such evidence might have in determining the voluntariness or involuntariness of a subsequently or previously obtained confession. While the "fact" that the test was taken may be relevant under some circumstances to the voluntariness of a confession, the actual results of the test would ordinarily have very little, if any, such relevance.

*Murphy,* 105 Md.App. at 315–16, 659 A.2d 384.

In this case, assuming that the claim of error is preserved, we are satisfied that any error was harmless beyond a reasonable doubt. We explain.

At the outset of trial, the court agreed with the parties that evidence as to the VSA test is generally inadmissible. On the second day of trial, before the jury was reconvened, the parties discussed the VSA test. Appellant sought admission in evidence of the fact that she took the test, because she believed it would show psychological coercion that induced her confession. On the other hand, she did not want the actual test results admitted.

The State argued that "the results are going to have to come out," because "how can it be coercive if she said she passed it?" The court agreed with the State, saying: "It really can't be coercive unless they told her she flunked it." The court added: "I think what's important is what was communicated to her." The court then said: "I will tell them [i.e., the jury] this evidence is not admissible as to the truth of the test results, whatever they may be. It is only admissible to weigh the voluntariness of the statement. Let's wait until it comes up."

Detective Rhone was questioned by the State about the interrogation of appellant. On cross-examination, appellant elicited from the detective the specifics regarding the interrogation. At the bench, defense counsel acknowledged: "I opened the door. I know the door is opened." The court then discussed what it would tell the jury about the VSA, to which defense counsel said, "That's fine. Do you want to do it now?" The Court indicated, "Right" and defense counsel responded, "All right."

The court then admonished the jury as to the limited purpose for which the VSA test was admissible. In the first of four separate cautionary instructions, the court said:

Ladies and gentlemen, at this point, let me just tell you this. One of the facts ultimately you must find is whether or not the statements of [appellant] were voluntary. You're about to hear evidence of a voice stress analysis test. This test has been determined to be scientifically unreliable and the results are not admissible in evidence because they are not reliable results. You may consider the circumstances of the

test only as a factor in determining whether or not the statements given to the police by [appellant] were voluntary.

Detective Rhone then testified that Sergeant Clark administered a VSA test to appellant.

On direct examination, Sergeant Clark testified as to how he administered the VSA test to appellant. He said:

The voice stress test is a microphone that you speak into. There are several questions that you ask. This particular test she was given twice. There are nine questions that was [sic] asked of her. Two questions pertaining to does she know anything regarding the murder of Mr. Whittington, or did she suspect who was involved in that particular murder.

At that point, the trial court, *sua sponte,* reiterated to the jury:

All right.... [L]et me remind you, ladies and gentlemen, that the evidence is admissible only for a limited purpose, for determining whether or not the statements were voluntary. It is not admissible for the truth of what it alleges.

Thereafter, the State showed Sergeant Clark the "voice stress analysis test information sheet," which contained a list of the questions asked of appellant and the results. Sergeant Clark testified that he explained to appellant how the test would be administered and then he gave her the test. The State then asked Sergeant Clark the results of the VSA test. At that point, defense counsel objected. A bench conference ensued, at which the following discussion occurred:

THE COURT: I think really—is he the one who communicated it to [appellant]?

[THE PROSECUTOR]: Yes. He is the actual one who took the test.

THE COURT: I understand, but if it's admissible just as to the fact as to its—

[THE PROSECUTOR]: Yes.

THE COURT: Then I have no problem with that. I'll admit it over your objection.

[THE PROSECUTOR]: So to be clear, he took the test, she showed deception, and he communicated that to her.

THE COURT: That's exactly right.

Upon counsel's return to the trial tables, the following colloquy transpired:

[THE PROSECUTOR]: Now, Detective Clark, you conducted the test with [appellant]; is that right?

[THE WITNESS]: Yes.

[THE PROSECUTOR]: *And what were the results of that test?*

[THE WITNESS]: *It indicated that she was lying about the questions.*

[THE PROSECUTOR]: And did you communicate that information to her?

[THE WITNESS]: Yes, I did.

[THE PROSECUTOR]: And what was her response?

[THE WITNESS]: She continued to deny.

[THE PROSECUTOR]: And what occurred after this?

[THE WITNESS]: Right after that, I briefed Detective Rhone of my findings, and that was the last contact I had with [appellant].

(Emphasis added).

Appellant's attorney then cross-examined Sergeant Clark, eliciting, among other things, that the test was not reliable "for purposes of proving anything in a court of law against a person." Rather, it is used as a tool of confrontation by the police. Further, Clark explained that he discussed the test results with appellant, and she continued to deny any involvement in her husband's murder. The sergeant then formulated two questions relating to the murder of appellant's husband.

On redirect, over appellant's objection, the State was permitted to elicit all nine questions asked of appellant.[6] At the

---

6. Sergeant Clark testified as follows:

conclusion of Sergeant Clark's testimony, the trial court once again instructed the jury:

Ladies and gentlemen, just for one, one last time. That last witness you heard was a very limited admissibility witness. That test is not reliable so, obviously, you can't infer anything from the results of a non-reliable test. So it is not being introduced for the truth of the matter or proof of guilt or innocence. It's just a factor you may consider when you determine whether or not you believe the statements that were given by [appellant] were voluntary or not.

At the close of all the evidence, the trial court admonished the jury for the fourth time:

This is just a reminder, Madam Foreman. You heard evidence during the course of this trial of the voice stress analysis test. Once again, that test has been determined to be scientifically unreliable and the results are not admissible in evidence because they simply are not reliable. You can consider the circumstances of that test only as a factor in determining whether or not the statements were voluntary.

As we noted, the voluntariness of appellant's confession was sharply contested at trial. Therefore, appellant was entitled to introduce evidence that she took a VSA test, in an effort to show that her confession was involuntary because she was subjected to psychological stress at the time she confessed. This does not mean, however, that the State was allowed to show that appellant failed the VSA test. Given that there was no claim of deceit as to the use of the VSA test, the test results were not relevant to establish the absence of police deception. Nor did defense counsel open the door, merely because he sought to introduce evidence that the VSA test was administered. We agree with appellant that she "did not

---

The first question, "is your name Sirena Whittington?" The second question was, "is the wall gray?" The third question, "are you sitting down"? The fourth, "did you shoot your husband?" The fifth, "is today Monday?" The sixth, "do you know who shot your husband?" The seventh question, "are you wearing a red sweatshirt?" The eighth, "have you ever gone over the speed limit?" And the ninth inquired, "am I wearing a tie?"

inject any evidence which made 'relevant' the actual outcome of an unreliable lie detector test." It follows that the court erred in admitting the results of the VSA test.

We must next determine whether the error was harmless beyond a reasonable doubt. Under the particular circumstances attendant here, we hold that the error was harmless. We explain.

In Maryland, when error has been established, unless a reviewing court, upon its own independent view of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)(footnote omitted). But, a defendant is not required to prove that the error did not contribute to the verdict. Instead, the question is whether the State proved beyond a reasonable doubt that the error did not contribute to the verdict. *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

As we have seen, the court carefully admonished the jury on four separate occasions, instructing it to consider the VSA test only as to the issue of the voluntariness of the statements. Further, the court told the jury that the test was not scientifically reliable. A jury is presumed to understand and follow the court's instructions. *See Veney v. State,* 251 Md. 182, 198, 246 A.2d 568 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969); *Wilson v. State,* 136 Md.App. 27, 72, 764 A.2d 284 (2000), *rev'd. on other grounds,* 370 Md. 191, 803 A.2d 1034 (2002). Indeed, in *State v. Moulden,* 292 Md. 666, 678, 441 A.2d 699 (1982), the Court of Appeals said: "[O]ur legal system necessarily proceeds upon the assumption that jurors will follow the trial judge's instructions."

There are, of course, situations when "the risk that the jury will not, or cannot, follow instructions is so great, that the practical and human limitations of the jury system cannot be ignored." *Rainville v. State,* 328 Md. 398, 411, 614 A.2d 949 (1992) (citing *Bruton v. U.S.,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). This is not such a case, however. Significantly, in addition to the repeated and clear cautionary instructions of the court, it was undisputed at trial that appellant shot her husband. Relying on a defense of spousal abuse and the battered wife syndrome, appellant testified in her own defense, and recounted a long history of physical violence and verbal abuse by her husband that culminated in his death.

In her testimony, appellant explained that her husband had threatened her so many times with a gun that she finally decided to "buy one of [her] own." She added that she bought the gun because she was "afraid," stating: "I was tired of him pulling a gun on me, and I didn't have none for myself. I wanted it for protection in case I needed it." Further, appellant recalled that, on the morning of the incident, her husband made her drive him to work. She related that, to her surprise, her husband had discovered her gun and questioned her about it. Appellant testified:

> And I said, I don't know what you are talking about. And that's when he choked me and pulled it out from somewhere—I don't know where it came from—and he was holding it to my head. And he told me how much he hated me, how much I messed up his life. He called me a bitch and told me I know how to fuck up a morning.

> \* \* \*

> He was still cussing me out and fussing at me. And the next thing I know, all I remember is him turning around laughing. I don't even know how I got it in my hands. And I heard it go off, and I saw him fall. . . .

\* \* \*

[DEFENSE COUNSEL]: Did you realize what had happened?

[APPELLANT]: No.

[DEFENSE COUNSEL]: Had you planned on doing this?

[APPELLANT]: No. I didn't want anything like that to happen. I just wanted him to leave me alone.

In view of the foregoing, we are satisfied that the error was harmless beyond a reasonable doubt.

## III.

 Appellant argues that the trial court erred in ruling that her expert witness, a board-certified expert psychiatrist, could not testify at trial to the issue of whether her confession was voluntary. Her argument is not preserved for review. Even if it had been, we would find it without merit.

The issue was first raised by the prosecutor at the close of the suppression hearing, when she inquired about the admission of Dr. Brody's testimony. Underscoring that its ruling was tentative, the court observed:

Now, the other issue I think we can leave and we don't have to really reach today until we see that, is in what form he can express his opinion. I don't necessarily—and I'm willing to be convinced otherwise, I don't think a forensic—I agree with Dr. Phillips, a forensic psychiatrist does not express that opinion. He expresses it in the way that Dr. Phillips does, whether someone has the capacity or not. You can't say I looked at the statement, it wasn't voluntary. You can say I've examined this person and that person lacked the capacity to make a voluntary statement.

So his testimony today was, it was a little broader than I think it should be in front of the jury, but we don't have to discuss that right now.

At trial, appellant called Dr. Brody as her last witness. After he was admitted as an expert in psychiatry, the State

asked to approach the bench. At the ensuing bench confer-
ence, the following conversation occurred:

[THE PROSECUTOR]: I just want to bring up when we
had this little issue in motions as to—I mean, when we get
to it, his opinion as to—I'm not exactly sure what his
opinion is going to be, but I remember specifically in
motions as to post-traumatic stress disorder, the voluntari-
ness of the statement. I just want to put my objection on
right now as to that.

THE COURT: Okay. Are you going to get into that?

[DEFENSE COUNSEL]: Tangently. Really, I'm using—

THE COURT: Because I believe the State is correct.
Whether or not a statement is involuntary is a legal opinion,
not a medical opinion, and it really exceeds his expertise to
say that. But he can certainly have an opinion on any
capacity to understand or what not. But he just can't say
flat out, in my opinion, it was involuntary.

[DEFENSE COUNSEL]: I was only going to touch on that
tangently.

THE COURT: Okay.

The parties returned to the trial tables. Dr. Brody then
testified about the battered wife syndrome. He also testified
as to his two meetings with appellant. He opined that, based
on his examination of appellant, she suffered from battered
wife syndrome at the time of her husband's murder. Dr.
Brody did not testify about the confession.

Appellant never disputed the trial court's understanding of
the scope of Dr. Brody's expert testimony. Appellant intend-
ed to elicit from Dr. Brody, and did elicit, that she was
suffering from depression and battered spouse syndrome at
the time of the occurrence. Because appellant never objected
to the court's ruling, and acquiesced to it, her complaint
cannot be heard on appeal. *See* Maryland Rule 8–131(a);
*Gilliam v. State,* 331 Md. 651, 691, 629 A.2d 685 (1993), *cert.
denied,* 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84
(1994)("As Gilliam did not object to the course of action
proposed by the prosecution and taken by the court, and

apparently indicated his agreement with it, he cannot now be heard to complain that the trial court's action was wrong."). *See also Wilson v. State,* 132 Md.App. 510, 526, 752 A.2d 1250 (2000) (stating that "the issue is not preserved for appellate review").

■■■ In any event, the court's ruling comported with pertinent case law. *See generally* Md. Rule 5–702; *Sippio v. State,* 350 Md. 633, 714 A.2d 864 (1998). "It is well settled that a psychiatrist may not opine 'concerning the defendant's actual intent at the time of an offense.' " *Fisher v. State,* 367 Md. 218, 269, 786 A.2d 706 (2001) (quoting *Hartless v. State,* 327 Md. 558, 611 A.2d 581 (1992)). The Court of Appeals reasoned in *Hartless* that "psychiatrists have not been shown to have the ability to precisely reconstruct the emotions of a person at a specific time, and thus ordinarily are not competent to express an opinion as to the belief or intent which a person in fact harbored at a particular time." *Hartless,* 327 Md. at 573, 611 A.2d 581. *Accord State v. Martin,* 329 Md. 351, 366, 619 A.2d 992 (discussing distinction explored in *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), between testimony about mental state at particular time and psychological profile that is consistent with particular mental state), *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993).

Relying on *Simmons,* we reiterated in *White v. State,* 142 Md.App. 535, 790 A.2d 754 (2002), that

"expert [testimony] that the defendant was *in fact* suffering from a specific psychiatric disorder on the date in question, is inadmissible as a matter of law because it usurps the jury's function and because a psychiatrist 'cannot precisely reconstruct the emotions of a person at a specific time.' "

*Id.* at 545, 790 A.2d 754 (quoting *Simmons,* 313 Md. at 48, 542 A.2d 1258). *See* Md. Rule 5–702.

Appellant relies on *Finke v. State, supra,* 56 Md.App. 450, 468 A.2d 353, for the proposition that expert psychiatric testimony regarding the voluntariness of a confession is admissible. In *Finke,* this Court affirmed that expert testimony regarding a defendant's ability to make free and intelligent

decisions at the time of his arrest is generally admissible. *Id.* at 498–99, 468 A.2d 353. Later, in the discussion of the propriety of a hypothetical question, the Court stated: "One of the principal reasons given by the court in sustaining the State's objection to the hypothetical question was that [the doctor] was being asked to render an opinion on the ultimate issue before the jury—voluntariness of the accused's inculpatory statement—without ever having examined the accused." *Id.* at 501–02, 468 A.2d 353. Thus, *Finke* does not support the proposition for which appellant cited it.

Moreover, "[i]t is well settled that 'the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.' " *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258 (1992) (quoting *Stebbing v. State,* 299 Md. 331, 350, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984)), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *accord Wise v. State,* 132 Md.App. 127, 135, 751 A.2d 24 (reaffirming trial judge's broad discretion as to admissibility of expert testimony and observing that judge's decision in this regard rarely serves as grounds for reversal), *cert. denied,* 360 Md. 276, 757 A.2d 811 (2000).

Here, the court permitted a full exploration of Dr. Brody's opinion regarding Whittington's general psychological profile and condition as it related to the voluntariness issue. But, expert testimony that Whittington's confession was, in fact, involuntary would have constituted testimony regarding appellant's state of mind at a particular point in time. The court properly precluded such testimony. In doing so, the court neither erred nor abused its discretion.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**